RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0272p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

ROGER DEAN GILLISPIE,

    *Plaintiff-Appellee*,

*v.*

MIAMI TOWNSHIP, OHIO,

    *Defendant*,

MATTHEW SCOTT MOORE,

    *Defendant-Appellant*.

No. 20-4119

---

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:13-cv-00416—Thomas M. Rose, District Judge.

Argued: July 29, 2021

Decided and Filed: November 30, 2021

Before: GIBBONS, STRANCH, and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Frank H. Scialdone, MAZANEC, RASKIN AND RYDER, CO., L.P.A., Cleveland, Ohio, for Appellant. David B. Owens, LOEVY & LOEVY, Chicago, Illinois, for Appellee. **ON BRIEF:** Frank H. Scialdone, Todd M. Raskin, Cara M. Wright, MAZANEC, RASKIN AND RYDER, CO., L.P.A., Cleveland, Ohio, for Appellant. David B. Owens, LOEVY & LOEVY, Chicago, Illinois, for Appellee.

    STRANCH, J., delivered the opinion of the court in which GIBBONS, J., joined and BUSH, J., joined in part. BUSH, J. (pp. 13–17), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

JANE B. STRANCH, Circuit Judge. Roger Dean Gillispie was convicted of two rapes and spent over 20 years in prison before the Ohio courts vacated his convictions, finding meritorious his claims of failure to disclose exculpatory evidence and actual innocence. Gillispie now brings five § 1983 claims against Matthew Scott Moore, the police officer responsible for much of the investigation and the identification of Gillispie as the likely perpetrator. Gillispie alleges that Moore suppressed exculpatory evidence, arranged an unduly suggestive eyewitness identification procedure, fabricated inculpatory evidence, assisted in maliciously prosecuting him, and destroyed exculpatory evidence. Moore claims entitlement to qualified immunity on each count. In an exhaustive and well-reasoned order, the district court determined that each of Gillispie's claims should proceed to trial. Moore appeals. Because Moore fails to abide by the basic, mandatory jurisdictional requirements governing appeals from denials of qualified immunity, we **DISMISS** the case for lack of jurisdiction.

## I. BACKGROUND

Following the district court, we do not "trudge through all" the "extensive" history of this case. *Gillispie v. City of Miami Twp.*, No. 3:13-CV-416, 2020 WL 5629677, at *1 (S.D. Ohio Sept. 21, 2020) ("Dist. Ct. Order"). We instead draw on the district court's careful chronology, noting that the state courts' previous decisions offer additional detail. *See, e.g.*, *State v. Gillispie*, 65 N.E.3d 791, 793–800 (Ohio Ct. App. 2016). Because the district court correctly applied the standard for summary judgment, as discussed below, we adopt the district court's recitation of the facts, *see Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020), including casting them in the light most favorable to Gillispie, *see Jackson v. City of Cleveland*, 925 F.3d 793, 803 (6th Cir. 2019), *cert. denied sub nom. City of Cleveland v. Jackson*, 140 S. Ct. 855 (2020).

In 1988, twin sisters were abducted and sexually assaulted in Miami Township, Ohio. Dist. Ct. Order, 2020 WL 5629677, at *1. A third woman was similarly assaulted outside the

Township's jurisdiction.[1]  *Id.*  Township Detective Sergeant Steven Fritz assigned Detective Gary Bailey to investigate the crimes.  *Id.* at *2.  Bailey interviewed the victims, who created composite images of the person who had assaulted them; one victim also saw and provided Bailey with the perpetrator's pants size.  *Id.*  Bailey compiled this information in a report that supplemented his main, handwritten report on the investigation's progress.  *Id.*

At the time, Gillispie worked as a security officer at General Motors (GM).  *Id.*  "There was tension and animosity between Gillispie and his superiors"—in particular, Defendant Richard Wolfe.  *Id.*  Wolfe had previously worked for and volunteered with the Township's police department, and his father had been the chief.  *Id.*  In 1989, a GM employee told his then supervisor, Wolfe, that one of his subordinates thought a composite of the suspect resembled Gillispie.  *Id.*  Wolfe contacted the department and met with Fritz, Police Chief Bailey, and a captain, bringing along Gillispie's employee photo.  *Id.*  He "suggested that Gillispie become a suspect," but "Bailey and Fritz were skeptical, thinking that Wolfe might be being vindictive."  *Id.*  Nevertheless, the Chief ordered Bailey and Fritz to investigate Gillispie.  *Id.*

Following their investigation, Bailey and Fritz ruled out Gillispie as a suspect and explained that decision in written supplemental reports.  The district court found that:

> Some of the reasons why Bailey and Fritz eliminated Gillispie as a suspect included:  (1) Gillispie was too large to have the pants size of the perpetrator that [the victims] had indicated; (2) Gillispie's lack of any criminal history, while the perpetrator's crimes were brazen—suggesting an extensive criminal history; (3) the perpetrator, who told the victims his name was "Roger," most likely would not have provided his real name; (4) Wolfe's (and other GM employees') apparent animosity toward Gillispie; (5) in their opinion, the picture of Gillispie that Wolfe brought did not match the composite; and (6) the long delay between when the police department had shared the composite of the perpetrator with GM and when Wolfe had suggested Gillispie as a suspect.  However, Bailey and Fritz cannot recall all of the reasons why they eliminated Gillispie as a suspect.  There were more reasons and details provided in the supplemental reports that they wrote.

---

[1] We follow the district court in referring to the sisters as "B.W." and "C.W." and the third woman as "S.C."

*Id.* Wolfe kept asking Fritz "whether the Township police department was going to do anything about Gillispie," and Fritz kept telling him that "Gillispie was not considered a good suspect." *Id.* at *3. Still, "Wolfe showed up at the police department claiming that he had additional information and providing an envelope with photos in it, which were given to Fritz." *Id.*

By June 1990, Bailey and Fritz had stopped working on the case; Bailey was reassigned, and Fritz left the department. *Id.* Before Fritz's departure, he told the Chief and a captain:

> Defendant Moore would be the best one to assign to the . . . investigation, so long as Moore had supervision. Fritz believed that Moore was tenacious and had the qualities of being a good investigator. However, at the time, Moore was relatively new to the force, and Fritz believed that Moore could be overzealous and had a tendency to go "rogue," sometimes continuing to pursue cases even when he lacked evidence.

*Id.*

Moore was assigned to the case and "received all of the supplemental reports that pre-dated his involvement in the investigation, including the supplemental reports detailing the first meeting with Wolfe and the elimination of Gillispie as a suspect (and the reasoning for doing so)." *Id.* Moore's ex-wife later testified that "the supplemental report concerning the previous elimination of Gillispie as a suspect frustrated and angered Moore." *Id.* Moore chose to write his own replacement "supplemental reports that do not reference Wolfe's initial meeting at the Township's police department or the circumstances concerning the elimination of Gillispie as a suspect," and instead identified Gillispie as a key suspect. *Id.* at *3–4. These reports were electronic as opposed to handwritten, Moore could edit them later, and he was not required to give the reports to supervisors until the investigation was closed. *Id.* at *4.

Moore proceeded to create photo lineups, asking the victims to identify the perpetrator. The district court described those lineups as follows:

> The photo lineups consisted of six photographs, one being of Gillispie. The photograph of Gillispie was from a GM identification badge. Moore did not know how old the picture was, but the identification badge indicated that it was issued on January 27, 1989. Moore made at least three different photo lineups; he placed the photo of Gillispie in a different location for each of the three victims' lineup procedure. He did not contemporaneously make a copy of the photo lineups that he showed to the victims, despite the "PHOTOGRAPHIC

> IDENTIFICATION GENERAL GUIDELINES" used by Moore and the Township's police department stating: "ALSO RUN A COPY OF THE PHOTO SPREAD USED!"
>
> Moore told each of the victims, before conducting the lineups, that he had a possible suspect for the crimes. C.W. conducted a lineup procedure with Moore first. The next day, when B.W. conducted a lineup procedure with Moore, C.W. came with her and waited in the lobby of the police department. Moore's report states that he had told C.W. not to speak with her sister about the lineup. After B.W.'s lineup, Moore informed the sisters that they had picked out the same suspect, that the suspect used to be a security guard at GM but was fired, that the suspect's name was Roger Gillispie, and that Roger Gillispie was the suspect that he (Moore) thought might be the one who committed the crimes. (Again, the perpetrator had told the victims that he was with security for the Best Products store and that his name was "Roger.") After S.C.'s lineup, Moore told S.C. that she had identified the person that he believed was the perpetrator.
>
> The picture of Gillispie used in the lineups appears to be different from the pictures of the five men used as fillers in the lineups. For example, Gillispie's face appears to be wider than the faces of the fillers in the lineup photos. (Testimony from the victims described the perpetrator as having a wide face.) His face is closer and larger than the faces of the others. Unlike the fillers, Gillispie's photo had been changed from its original size by the Montgomery Valley Regional Crime Lab, at Moore's request. Also, Gillispie's photo had a different finish than the other photos in the lineups. Moore admitted that there was a difference in quality between Gillispie's photo and the photos of the fillers, and that Gillispie's photo seemed to be "slightly duller." Additionally, two of the filler photos used were of Township officers.

*Id.* at *4–5 (citation omitted). Three such lineups were ultimately introduced at trial, and Moore testified about each of them. *Id.* at *5.

After Moore conducted the lineups, he interviewed Gillispie at the police station in August 1990. *Id.* He met with the prosecutor to present his conclusion that Gillispie was the perpetrator; as a result, the prosecutor charged Gillispie. *Id.* In September 1990, Moore interviewed Gillispie's ex-girlfriend, Torrie Mitchell, and recorded the interview. *Id.* Although Moore's reports stated that Mitchell said Gillispie wore a gold chain, a detail the victims had identified, Mitchell later testified that she said no such thing and that Moore's reports and transcripts contained other falsehoods. *Id.*

Before trial, Gillispie's attorney hired an investigation company. *Id.* After leaving the police department, Fritz had gone to work for that company, and was assigned to Gillispie's case.

*Id.* Gillispie claimed that on the day of the rapes, which was "hot and sunny," he was at a campground in Kentucky, so Fritz sought to obtain the campground's records. *Id.* at *6. But the records "were in disarray," and only a few existed from around the day of the rapes. *Id.* "Moore had received some records from the campground, but Gillispie alleges that he and his friends were there far more often than indicated in the records that Moore received." *Id.*

Gillispie was indicted in October 1990 and found guilty (twice, including after being granted a new trial) in 1991. *Id.* While incarcerated, he filed several postconviction motions in state and federal court. *Id.* The Ohio courts did not grant relief. *See, e.g.*, *State v. Gillespie* [sic], No. 12941, 1993 WL 10927 (Ohio Ct. App. Jan. 21, 1993). The Ohio Court of Appeals rejected Gillispie's *Brady* claims but did order an evidentiary hearing about whether the existence of a viable alternative suspect required a new trial. *State v. Gillispie*, Nos. 22877 & 22912, 2009 WL 2197052 (Ohio Ct. App. July 24, 2009). After the Ohio trial court held the hearing and denied a new trial, Gillispie appealed; while that appeal was pending, he prevailed on his federal claims. Dist. Ct. Order, 2020 WL 5629677, at *6. A magistrate judge found that Ohio had violated Gillispie's right to due process and ordered the state to release or retry him. *Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482, 509 (S.D. Ohio 2011). As the district court put it:

> Back in Ohio state court, the state appeals court considered the appeal of Gillispie's motion for a new trial following the hearing that it had ordered. On April 13, 2012, based on the alternative suspect, it reversed the trial court's ruling. *State v. Gillispie*, No. 24456, 2012 WL 1264496 (Ohio Ct. App. 2012), *amended on reconsideration by State v. Gillispie*, 985 N.E.2d 145, (Ohio Ct. App. 2012) (per curiam) (deleting paragraph 45 from original opinion). The Ohio appeals court vacated Gillispie's conviction and sentence and remanded for a new trial. *Id.* at *12 ("The order of the trial court denying Gillispie's motion for a new trial is Reversed. Gillispie's conviction and sentences are Vacated, and this cause is Remanded for a new trial[.]"). On November 7, 2012, the Ohio Supreme Court denied the State leave to appeal that decision. *State v. Gillispie*, 977 N.E.2d 694 (Ohio 2012) (table).

Dist. Ct. Order, 2020 WL 5629677, at *6 (footnote omitted) (citation formatting modified). Ohio later abandoned its appeal of the magistrate judge's decision. *Id.* at *7. Further litigation followed, including in this court. *See, e.g.*, *Gillispie v. Warden, London Corr. Inst.*, 771 F.3d 323 (6th Cir. 2014).

In 2013, Gillispie filed a motion to compel discovery of Bailey and Fritz's supplemental reports or dismiss the indictment with prejudice if the state would not or could not provide them. *Id.*; *see State v. Gillispie*, 65 N.E.3d 791 (Ohio Ct. App. 2016). The state did not provide the reports, the trial court dismissed the new indictment with prejudice, and the Ohio Court of Appeals upheld that decision while noting that "Gillispie could not be constitutionally convicted of the offenses without production of the supplemental police reports themselves." Dist. Ct. Order, 2020 WL 5629677, at *7 (quoting *Gillispie*, 65 N.E.3d at 808).

Finally, and importantly, "[a]ccording to Gillispie, he is innocent of the rapes and could not have committed them because he was with a group of friends on August 5, 1988[,] and in Kentucky on August 20, 1988." *Id.* at *7. The Ohio Court of Appeals noted the distinct possibility that an alternative suspect—whose identity is known, whose "physical description resembles the composites and the descriptions given by the rape victims in Gillispie's case," and who exhibited several other key characteristics aligning with the crimes—committed the rapes, not Gillispie. *Gillispie*, 2012 WL 1264496, at *9–10. Gillispie alleges "that he was traumatized by over 20 years of wrongful incarceration." Dist. Ct. Order, 2020 WL 5629677, at *7.

## II. ANALYSIS

Gillispie argues that this court does not have jurisdiction over Moore's appeal. Appellate jurisdiction over a district court's denial of a claim of qualified immunity exists "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The onus is on the defendant to comply with this jurisdictional limit: "We have jurisdiction only to the extent that the defendant 'limit[s] his argument to questions of law premised on facts taken in the light most favorable to the plaintiff.'" *Adams*, 946 F.3d at 948 (quoting *Philips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008)).

For qualified immunity appeals, that means "we do have jurisdiction to review whether the district court properly adopted the plaintiff's version of the facts in assessing qualified immunity (i.e., whether it applied the correct summary judgment standard)." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277 (6th Cir. 2020); *see generally Jackson*, 925 F.3d at 806 (outlining the standard courts must apply at summary judgment). But that analysis is meant only

to facilitate review of "the 'purely legal' question of 'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.'" *Ouza*, 969 F.3d at 276 (quoting *Mitchell*, 472 U.S. at 528 & n.9); *see also Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014); *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir. 2003). That is the "precise scope" and outer boundary of appellate jurisdiction in this context. *Ouza*, 969 F.3d at 277.

As the Supreme Court made clear in *Johnson v. Jones*, 515 U.S. 304 (1995), defendants cannot "appeal a denial of a motion for summary judgment based on qualified immunity 'insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Adams*, 946 F.3d at 948 (quoting *Johnson*, 515 U.S. at 320). The same is true for appeals that challenge the district court's determination of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018) (quoting *Johnson*, 515 U.S. at 313).

Indeed, "[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." *Mitchell*, 472 U.S. at 528. Because the scope of the defendant's appeal is so circumscribed, "we 'need look no further than the district court's opinion,' and 'we often may be able merely to adopt the district court's recitation of facts and inferences.'" *Adams*, 946 F.3d at 948 (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)). This court simply "defer[s] to the district court's determinations of fact." *Id.* "And beyond those determinations, 'a defendant may not challenge the inferences that the district court draws from those facts, as that too is a prohibited fact-based appeal.'" *Id.* (quoting *Barry*, 895 F.3d at 443).

Two exceptions to these general rules exist, neither of which applies in this case. "First, we may overlook a factual disagreement if a defendant, despite disputing a plaintiff's version of the story, is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Adams*, 946 F.3d at 948 (quoting *Barry*, 895 F.3d at 443). As explained below, Moore refuses to do so here. "And second, in exceptional circumstances, we may decide an appeal challenging the district court's factual determination if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Id.* (quoting *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007)).  Far from the situation *Scott* contemplated, in which a video recording in the record "utterly discredited" the plaintiff's narrative, 550 U.S. at 380, the record contradicts neither Gillispie's version nor the district court's various factual determinations in this case, much less blatantly so.

"We have consistently enforced *Johnson*'s jurisdictional bar in cases in which the defendant's qualified immunity appeal is based solely on his or her disagreement with the plaintiff's facts."  *Ouza*, 969 F.3d at 277 (collecting cases).  If "disputed factual issues are 'crucial to' a defendant's interlocutory qualified immunity appeal, we may not simply ignore such disputes; we remain 'obliged to dismiss [the appeal] for lack of jurisdiction.'"  *Adams*, 946 F.3d at 951 (alteration in original) (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)); *see also, e.g.*, *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998).  Even if a defendant asserts arguments about whether the law was clearly established, if he "fails to concede the most favorable view of the facts to [the plaintiff] and instead relies solely on his version of the facts," this court cannot consider those otherwise valid arguments because he has failed to satisfy a crucial jurisdictional prerequisite.  *Adams*, 946 F.3d at 950–51.

When determining if disputed factual issues are "crucial" to a defendant's appeal, we consider whether "there is enough record evidence demonstrating that [the district court's] findings of facts and inferences are not blatantly and demonstrably false," the disputes are more than "minor," and the disputes are not "immaterial to the legal issues raised by the appeal."  *Id.* at 951 (first quoting *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 602 n.5 (6th Cir. 2005); then quoting *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001)).  Ultimately, if the factual disputes are so central as to "serve as the basis" for the defendant's legal argument on appeal, then we do not have jurisdiction over the appeal at all.  *Id.*  But if we find that the factual disputes are not "crucial" to the appeal, we will "separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')."  *Id.* at 948 (quoting *Roberson*, 770 F.3d at 402); *see also Bunkley*, 902 F.3d at 560; *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015).

We "find the district court's opinion [in] this case to be well-reasoned and supported by the record, and therefore only briefly address the various arguments raised by [Moore]." *Adams*, 946 F.3d at 949. The district court's detailed opinion correctly applied the summary judgment standard, adopting Gillispie's statement of the facts and making appropriate inferences from them. *See Ouza*, 969 F.3d at 276. But almost all of Moore's argument consists of disagreements with Gillispie's facts and the district court's determinations that multiple genuine disputes of material fact exist. Those are unreviewable at this stage. *See id.* at 277; *Adams*, 946 F.3d at 948. Moore consistently ignores our repeated instruction that "to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of the facts for purposes of the appeal." *Ouza*, 969 F.3d at 277 (quoting *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010)).

Moore argument on appeal is simply a challenge to the district court's determinations that genuine issues of material fact exist on the core claims in the case. He contends that it was error to find a factual dispute regarding "whether the prosecutor was aware that Fritz and Bailey had previously ruled Plaintiff out as a suspect in the rapes" and "whether Det. Moore possessed, and failed to disclose, the supplemental reports allegedly authored by Fritz and Bailey eliminating [Gillispie] as a suspect in the rapes." Moore claims that no evidence exists that such reports "were ever placed in the case file or that Det. Moore was aware of this fact at the time that he authored his report." He asserts that the district court erred regarding the suggestive identification procedures because "the sizes of the photographs did not steer the women toward identifying [Gillispie] as the suspect." Moore challenges the finding that a dispute could exist about fabricated evidence "based upon the inclusion of a statement with Det. Moore's report that [Gillispie] was the newest suspect in the case." He attacks the district court's determinations surrounding probable cause for Gillispie's arrest. Moore also asserts that "[t]he reports allegedly authored by Fritz and Bailey were not 'material exculpatory evidence.'" And he contends there is in fact no genuine dispute over destroyed evidence. Additional examples abound.

This repeated refusal to accept Gillispie's version of the facts is fatal to Moore's appeal. The factual disputes he raises in his briefing serve as the sole bases for his arguments about clearly established law, and he continued with that approach at oral argument. *See Adams*, 946

F.3d at 951. These disputes are "crucial" to Moore's contentions, *see id.*, which assert that because the district court erred in finding certain facts, the law was not clearly established. Moore effectively says that "the resolution of these factual issues is needed to resolve the legal issue"—which, as we have recognized, strips jurisdiction entirely. *Beard*, 402 F.3d at 602 n.5; *Adams*, 946 F.3d at 951. These disputes are not minor, and Moore's insistence that the district court's thorough opinion is blatantly and demonstrably false is unavailing. *See Adams*, 946 F.3d at 951. We conclude that Moore's failure to comply with the basic requirements of an appeal from a denial of qualified immunity means that we do not have jurisdiction over his appeal.**2**

Moore's appeal is troubling not only because it violates the core jurisdictional rules governing this context, but also because it implicates the reasons those rules exist in the first place. *Johnson* was published more than 26 years ago, and litigants have been on notice for more than two decades that fact-intensive claims of entitlement to qualified immunity "can consume inordinate amounts of appellate time." 515 U.S. at 316. Such claims stymie the proper development of a case that should be based on the "comparative expertise of trial and appellate

---

**2**Even if Moore's arguments could be reasonably characterized as contending only that the applicable law was clearly established, we would still reject them. First, well before the events at issue in this case, "it was clearly established law that prosecutorial withholding of exculpatory evidence violates a criminal defendant's Fourteenth Amendment right to due process," with the obligation to disclose extending to police officers as well and encompassing all, not some, possibly exculpatory material. *Jackson*, 925 F.3d at 823–24; *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2015); *Moldowan v. City of Warren*, 578 F.3d 351, 382–89 (6th Cir. 2009). Second, as early as 1967, it was clearly established that a person the police suspected of committing a crime had "a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)); *see also Manson v. Brathwaite*, 432 U.S. 98, 106 (1977); *Simmons v. United States*, 390 U.S. 377, 384 (1968). Third, "as far back as 1935, the Supreme Court recognized that the introduction of fabricated evidence violates 'the fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Jackson*, 925 F.3d at 825 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). "[A] defendant officer could not 'seriously contend that a reasonable police officer would not know that [his] actions [including fabricating evidence] were inappropriate and performed in violation of an individual's constitutional . . . rights." *Id.* at 826 (alterations in original) (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999)). Fourth, "individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." *King v. Harwood*, 852 F.3d 568, 582–83 (6th Cir. 2017) (quoting *Webb v. United States*, 789 F.3d 647, 660, 665 (6th Cir. 2015)). Those rights were clearly established by 1990 and have been readily applied at that level of generality since. *Jackson*, 925 F.3d at 827 (citing *McShane v. Moldovan*, 172 F.2d 1016, 1019 (6th Cir. 1949)); *King*, 852 F.3d at 582–83; *Spurlock*, 167 F.3d at 1006–07. Fifth, it was clearly established before 1990 that a plaintiff need not show that the officer acted in bad faith when "material exculpatory evidence was lost or destroyed" and that the evidence's exculpatory value was apparent. *Moldowan*, 578 F.3d at 392; *California v. Trombetta*, 467 U.S. 479, 488–89 (1984); *see also United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

courts." *Id.* at 317. And they can "require reading a vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials," resulting in "greater delay" in adjudicating cases. *Id.* at 316. Moreover, as the Supreme Court explained in *Johnson*:

> The close connection between this kind of issue and the factual matter that will likely surface at trial means that the appellate court, in the many instances in which it upholds a district court's decision denying summary judgment, may well be faced with approximately the same factual issue again, after trial, with just enough change brought about by the trial testimony) to require it, once again, to canvass the record. That is to say, an interlocutory appeal concerning this kind of issue in a sense makes unwise use of appellate courts' time, by forcing them to decide in the context of a less developed record, an issue very similar to one they may well decide anyway later, on a record that will permit a better decision.

*Id.* at 316–17. Because these considerations are so important, when "it clearly appears . . . that the defendant is unnecessarily protracting the litigation" through pursuing such an appeal, monetary sanctions are even appropriate. *Berryman*, 150 F.3d at 565.

Here, "there is clearly a factual dispute at the heart of the qualified immunity issue." *Id.* at 562. Moore has "contradicted [Gillispie's] version of the facts at every turn." *Id.* We acknowledged not long after *Johnson* that "defendants sometimes attempt simply to protract the litigation and manipulate the fact-law distinction . . . to create the appearance of jurisdiction." *Id.* at 564. That is particularly concerning here because this case presents the exact scenario against which the *Johnson* Court warned: a voluminous record, a trial court's able factfinding, and a subsequent appeal looming should this case proceed to trial and Gillispie prevail. It has been clear for decades to litigants that this litigation strategy is improper. An appeal choosing to take this tack anyway delays the administration of our justice system and is a waste of judicial resources.

### III. CONCLUSION

For the reasons discussed above, we **DISMISS** Moore's appeal in its entirety for lack of jurisdiction.

―――――――――――――――――――――――――――――――――――――――――
**CONCURRING IN PART AND DISSENTING IN PART**
―――――――――――――――――――――――――――――――――――――――――

JOHN K. BUSH, Circuit Judge, concurring in part and dissenting in part. I agree that Matthew Scott Moore's purely factual challenges are beyond the scope of our interlocutory jurisdiction. But when a defendant brings us both reviewable legal determinations and nonreviewable factual determinations, as Moore has done, we should separate the issues and exercise our jurisdiction over the legal challenges. I would do just that and affirm the district court, so I respectfully dissent.

Defendants to suits under 42 U.S.C. § 1983 once claimed a right to interlocutory review of the factual determinations in summary-judgment denials by dressing their challenges in the garb of a challenge to the denial of qualified immunity. But the Supreme Court foreclosed that dubious route to mid-case review in *Johnson v. Jones*, 515 U.S. 304 (1995). It held that the portion of a qualified-immunity denial that "determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial. . . . is not appealable." *Johnson*, 515 U.S. at 313. Rather, we "limit [our] interlocutory resources to questions of law," *Romo v. Largen*, 723 F.3d 670, 678 (6th Cir. 2013) (Sutton, J., concurring), considering just the "legal issue[s] that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Mitchell v. Forsyth*, 472 U.S. 511, 529, n.10 (1985). "[T]he precise scope of our appellate jurisdiction on interlocutory appeal from a denial of qualified immunity is whether 'the plaintiff's version of facts demonstrates a violation of clearly established rights.'" *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277–78 (6th Cir. 2020) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir. 2003)).

My colleagues and I agree on that much. We disagree on a more difficult question: whether all of Moore's factual disputes are so "crucial to" his appeal that we lack interlocutory jurisdiction. The majority relies on our opinion in *Adams v. Blount County* to hold that "[e]ven if a defendant asserts arguments about whether the law was clearly established, if he 'fails to concede the most favorable view of the facts to [the plaintiff] and instead relies solely on his version of the facts,' this court cannot consider those otherwise valid arguments because he has

failed to satisfy a crucial jurisdictional prerequisite." Majority Opinion at 9 (quoting *Adams v. Blount County*, 946 F.3d 940, 950–51 (6th Cir. 2020). In my view, *Johnson* did not raise such a high barrier to our interlocutory review, and the majority's approach contravenes binding precedent.

Start with the simple proposition that "[f]acts . . . are crucial to every case. How crucial depends on context." *Sevy v. Barach*, 815 F. App'x 58, 68 (6th Cir. 2020) (Readler, J., concurring). For example, in *Johnson*, the defendants' only claim was of "evidence insufficiency." 515 U.S. at 307–09; *see also Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994) ("When asked at oral argument if they could lose the factual dispute and still prevail, defendants' lawyer answered no."). The facts there were "crucial because they [were] outcome-determinative." *Sevy*, 815 F. App'x at 68 (Readler, J., concurring); *see also Barry v. O'Grady*, 895 F.3d 440, 446 (6th Cir. 2018) (Sutton, J., dissenting) ("*Johnson* establishes an important principle—but a limited principle. An officer may not appeal the denial of a qualified immunity ruling solely on the ground that the plaintiff's record-supported facts are wrong.").

But many cases are not like *Johnson*. "Denial of summary judgment often includes a determination that there are controverted issues of material fact, . . . and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable." *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996). Indeed, after *Johnson*, the Supreme Court in *Plumhoff v. Rickard* "appear[ed] to cabin the reach of *Johnson* to 'purely factual issues that the trial court might confront if the case were tried.'" *Roberson v. Torres*, 770 F.3d 398, 403 (6th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014)). Taking these Supreme Court cases together, we adopted "a single jurisdictional rule: we may not decide a challenge aimed solely at the district court's determination of the record-supported evidence, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). Our approach in those cases has been to "excise the prohibited fact-based challenge," *id.*, thus "'obviating the need to dismiss the entire appeal for lack of jurisdiction.'" *Id.* (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)); *see also DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015).

Following that approach here, I find several legal challenges amenable to our interlocutory review. First, Moore argues that he satisfied the requirements of *Brady* by informing the prosecutor that other detectives had ruled out Roger Dean Gillispie as a suspect in the rape investigation. In so doing, he accepts as true the facts stated in the summary-judgment order. *Gillispie v. City of Miami Twp.*, 2020 WL 5629677, at *12 (S.D. Ohio Sep. 21, 2020) (finding that the prosecutor testified that Moore had told him Gillispie had previously been ruled out as a suspect). But he reaches a different legal conclusion based on those facts—namely, that he satisfied *Brady* by merely informing the prosecutor that Gillispie had been ruled out without providing the supplemental reports or the relevant details they contained.

Moore further contends that the district court failed to show that his alleged *Brady* violations were clearly established because the court defined the violations "at a high level of generality" and did not point to any "clearly established law that was particularized to the facts of the case." We should reject these legal arguments. It was clearly established before the events here that "the duty to disclose evidence falls on the state as a whole," and it applies to police as well as prosecutors. *Jackson v. City of Cleveland*, 925 F.3d 793, 824 (6th Cir. 2019); *see also Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) ("As far as the Constitution is concerned, a criminal defendant is equally deprived of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same."). The evidence here, viewed in the light most favorable to Gillispie, shows only that Moore informed prosecutors that Gillispie was previously ruled out as a suspect, not that he informed them about the existence or exculpatory content of the supplemental reports. *See Gillispie*, 2020 WL 5629677, at *12.

Regarding the suggestive-identification claim, Moore argues that it was not clearly established in 1990 that his conduct violated the Constitution because two Ohio courts concluded that Moore's conduct "***did not*** violate the Plaintiff's constitutional rights." He thus challenges the district court's purely legal conclusion regarding the denial of qualified immunity. And his argument fails because it has been clearly established since 1967 that "[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and

conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Police actions like displaying "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized" and "indicat[ing] to the witness that they have other evidence that one of the persons pictured committed the crime," which the district court found here, can meet this standard. *Simmons v. United States*, 390 U.S. 377, 383–84 (1968).

Moore also asserts that he has qualified immunity from the fabrication-of-evidence claim on at least two strictly legal bases: (1) the allegedly fabricated evidence was never admitted at trial, so no right was violated, and (2) the district court cited no authority to show that it was clearly established in 1990 that fabricated evidence never introduced at trial violates a constitutional right. Both arguments also fail. In *Jackson*, we held (1) that fabricated evidence need not be admitted at trial to unconstitutionally affect its outcome, and (2) that the right to a trial free from such evidence has been clearly established for nearly a century. 925 F.3d at 816–17.

I agree that Moore devotes a sizable majority of his argument to nonreviewable factual challenges. But we have a duty to "excise the prohibited fact-based challenge[s] so as to establish jurisdiction" over his legal arguments. *Bunkley*, 902 F.3d at 560. Following that approach and affirming the denial of qualified immunity here would have given the parties and the district court "clear direction as to what was at stake and what law should control the jury trial at prongs one and two of the qualified immunity inquiry." *Barry*, 895 F.3d at 449 (Sutton, J., dissenting). "And in a future appeal, the law of the case would establish the contours of what the jury could permissibly decide." *Id.* Instead, the parties will return to the district court with nothing gained, and over a year lost.

The majority opinion appears to recognize what is lost by dismissing the entire appeal on jurisdictional grounds. In a footnote, it offers a hypothetical rejection of Moore's legal arguments. Majority Opinion at 11 n.2. But if we lack jurisdiction, we cannot reach those questions. "Hypothetical jurisdiction produces nothing more than a hypothetical judgment— which comes to the same thing as an advisory opinion, disapproved by th[e Supreme] Court from

the beginning." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (citing *Muskrat v. United States*, 219 U.S. 346, 362 (1911); *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792)).  And the issues certainly cannot be considered "actually decided" for purposes of the law-of-the-case doctrine.  *Howe v. City of Akron*, 801 F.3d 718, 739–40 (6th Cir. 2015) (citing 18B Charles Alan Wright, Arthur H. Miller, and Edward H. Cooper, Federal Practice and Procedure § 4478 (4th ed. 2015)).  The approach I suggest spares the parties this uncertainty about the law governing this case.

\* \* \*

Binding authority demands that we exercise our proper jurisdiction over Moore's legal challenges.  "Doing otherwise is a disservice to the Court and the parties."  *Sevy*, 815 F. App'x at 67 (Readler, J., concurring).  So for the reasons above, I concur in the majority's dismissal of Moore's purely factual challenges, but I respectfully dissent from its refusal to resolve his legal challenges.